United States District Court
Southern District of Texas
**ENTERED**
March 20, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | § |
| | § |
| VS. | § CRIMINAL ACTION NO. 4:22-CR-00612 |
| | § |
| EDWARD CONSTANTINESCU, *et al.* | § |

## ORDER

Pending before the Court is Defendant John Rybarczyk's ("Rybarczyk") Second Joint Motion to Dismiss.[1] (Doc. No. 397). The United States responded in opposition. (Doc. No. 422). Rybarczyk (joined by co-defendants Hrvatin, Matlock, Deel, and Cooperman) replied. (Doc. No. 434). The parties have extensively argued the motion. For the reasons outlined below, the Court **GRANTS** Rybarczyk's Motion to Dismiss and hereby dismisses without prejudice the Superseding Indictment ("Indictment") (Doc. No. 134) pursuant to the Federal Rules of Criminal Procedure.

## LEGAL STANDARD

Rule 12(b)(3)(B) permits a party to move to dismiss the indictment based on "a defect" therein, including "failure to state an offense." Fed. R. Crim. Pro. 12(b)(3)(B)(v). "The propriety of granting a motion to dismiss an indictment…by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact." *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011) (citing *United States v. Flores*, 404 F.3d 320, 324 (5th Cir.2005)) (internal quotation marks omitted). "If a question of law is involved, then consideration of the motion is generally proper." *Id.* "In reviewing a challenge to

---

[1] Co-Defendants Stefan Hrvatin ("Hrvatin"), Mitchell Hennessey ("Hennessey"), Perry "PJ" Matlock ("Matlock"), Gary Deel ("Deel"), Tom Cooperman ("Cooperman"), and Edward Constantinescu ("Constantinescu") join this motion.

an indictment alleging that it fails to state an offense, the court is required to take the allegations of the indictment as true and to determine whether an offense has been stated." *Id.* (citation omitted); *see also United States v. Hogue*, 132 F.3d 1087, 1089 (5th Cir. 1998). "In an indictment upon a statute, it is not sufficient to set forth the [offense] in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the [offense] intended to be punished." *Russell v. United States*, 369 U.S. 749, 765 (1962) (citations omitted) (cleaned up). "Undoubtedly, the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Id.* (citing *United States v. Hess*, 124 U.S. 483, 487 (1888)).

## ANALYSIS

### A. Background

This is a securities fraud case brought pursuant to 18 U.S.C. § 1348 and 2, and 18 U.S.C. § 1349. The Government alleges that the Defendants engaged (and conspired to engage) in a scheme to "maximize their profits" via the purchase and sale of certain securities "at the expense of their…followers" by posting false and misleading information and by failing to post other important information on their social media accounts. (*See* Doc. No. 134 at ¶10-14). Essentially, the Government alleges that the Defendants schemed to "pump and dump" certain securities by using their followers to "artificially increase" the price of those securities and then selling their own shares in private. (*See id.*).

The Government indicted and then superseded the indictment of the Defendants prior to the recent Supreme Court ruling in *Ciminelli v. United States*, 598 U.S. 306 (2023), and the Fifth

Circuit opinion in *United States v. Greenlaw*, 84 F.4th 325 (5th Cir. 2023). Those two cases followed on the heels of Supreme Court decisions in *Shaw v. United States* and *Kelly v. United States*, "in which the Supreme Court has urged courts to prevent fraud convictions based on deceit alone[.]" *Greenlaw*, 84 F.4th at 351 n.14; *see also Shaw v. United States*, 580 U.S. 63 (2016), *Kelly v. United States*, 140 S. Ct. 1565 (2020). Indeed, in *Kelly*, the Supreme Court held (in the context of the federal wire fraud statute) that the Government needs to show not only that the defendant "engaged in deception," but that "an object of their fraud was property." *Kelly*, 140 S. Ct. at 1571.

Prior to the Supreme Court's 2023 decision in *Ciminelli*, the Second Circuit had adopted a theory of fraud known as the "right to control" theory. Under the "right to control" theory, the Government could prove that defendants engaged in a "scheme to defraud" victims of "money or property" by showing, among other factors, that the scheme "denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015), *abrogated by Ciminelli*, 598 U.S. at 306. In *Ciminelli*, the Supreme Court rejected this theory, holding that "the so-called right to control is not an interest that had long been recognized as property when the wire fraud statute was enacted." *Ciminelli*, 598 U.S. at 313. The Court further held that the federal fraud statutes are "limited in scope to the protection of property rights." *Id.* at 314. In other words, the Court limited the scope of the fraud statute by holding that, despite the deceitful conduct involved, it does not cover fraudulent schemes whose object is to harm a victim's right to have accurate information; only schemes that harm a victim's traditional property right are actionable.

Now this Court is faced with an Indictment that, while not explicitly citing the "right-to-control theory," does allege that the Defendants' social media followers were "misl[ed]" by false statements and material omissions when they were "induce[d]" to purchase the securities that the

Defendants were promoting on their social media pages and other platforms. (Doc. No. 134 at ¶ 1). The basis of the case is premised upon the provision of false information or the failure to provide information, most of which pertained to the Defendants' plans to invest or divest in a certain stock or Defendants' price targets for a certain stock. (*Id.* at ¶ 13). Nevertheless, the Government has maintained in response to renewed motions to dismiss that the Indictment is sufficient because it asserts that Defendants actually intended to deprive their followers of traditional property interests. The Defendants disagree.

Defendants have moved to dismiss the Indictment pursuant to Fed. R. Crim. Pro. 12(b)(3)(B)(v) for failure to state an offense under 18 U.S.C. § 1348 and 2, and 18 U.S.C. § 1349. Defendants' motion relies primarily on *Ciminelli* and *Greenlaw* to argue that Defendants have been charged with an indictment that is legally insufficient and/or that they were improperly indicted under a "right-to-control theory" of securities fraud.

Count One of the Indictment charges Defendants with Conspiracy to Commit Securities Fraud under 18 U.S.C. § 1349. Counts Two through Twenty charge various individual defendants with Securities Fraud under 18 U.S.C. § 1348 and 2 based on the social media postings by the Defendants concerning their purchase and sale of nineteen individual stocks.[2] As alleged in the Indictment, Defendants are accused of engaging in a scheme to "pump and dump" securities based on false and misleading information about those securities that the defendants published, or material omissions they failed to publish, on social media platforms including Twitter[3] and Discord. (Doc. No. 134 at ¶ 1). As part of the scheme, the Government alleges that the Defendants "purchased shares of a [listed] security in their trading accounts, posted messages on social media

---

[2] No defendant is alleged to have violated the statute as to all nineteen stocks; the relevant counts corresponding to each stock are specific to individual defendants as named in the Indictment.

[3] Twitter is the former name for the social media website now known as "X." Consistent with the allegations in the Indictment, the Court will refer to this website as "Twitter" for the purposes of its analysis.

4

platforms with false, positive information about the security—including, among other things, the defendants' position in the security, how long the defendants intended to hold the security, the defendants' view that the security would increase in price, and the price the security could reach—to induce other investors to buy the security and artificially drive up its price." (Doc. No. 134 at ¶ 1). Thereafter, the Defendants are alleged to have "secretly sold their own shares of the security at a higher price to secure a profit for themselves, at or around the time they posted messages to induce other investors to purchase the same security and concealed their intent to sell." (*Id.*). The Government alleges that "from in or around January 2020 to in or around April 2022, the [D]efendants profited at least approximately $114 million from their scheme." (*Id.*).

The Court notes that the Defendants are not alleged to have been insiders of the companies or otherwise to have been in control of the stocks at issue in any formal way. Rather, all of the stocks implicated in the Indictment were publicly traded on the market, and the Defendants were individuals who traded on the market, as were their alleged victims or followers.

Securities fraud under Title 18 prohibits executing or attempting to execute a "scheme or artifice…to defraud any person in connection with any" registered security or "to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any" registered security. *See* 18 U.S.C. § 1348 and 2; *see also Greenlaw*, 84 F.4th at 339 n.5. The Fifth Circuit has interpreted the securities fraud statute (18 U.S.C. § 1348) to require that the substantive act must be accompanied by a specific "intent to defraud" and to prohibit the execution of a "scheme to defraud." *Greenlaw*, 84 F.4th at 339.[4]

---

[4] The conspiracy count requires the Government to prove that the Defendants had the "specific intent to defraud" as well as that 1) two or more persons made an agreement to commit an unlawful act; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, with the intent to further the unlawful purpose." *Greenlaw*, 84 F.4th at 347 (citations omitted). Title 18 U.S.C. § 1349 provides that "any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

Neither "intent to defraud" nor "scheme to defraud" is defined in the statute. Thus, the Court's understanding of these two elements is derived primarily from case law. As noted, the Defendants moved to dismiss this Indictment based on two recent authoritative and binding decisions—*Greenlaw* and *Ciminelli*. Both of these cases touch on "intent to defraud" and "scheme to defraud," and, generally speaking, both appear to narrow the reach of federal fraud statutes.[5]

### B. Intent to Defraud

In *Greenlaw*, the Fifth Circuit examined the jury instructions in a Title 18 securities and wire fraud case and held that an "intent to defraud" requires **both** 1) an intent to deceive and (2) an intent to cause some harm to result from the deceit. *Greenlaw*, 84 F.4th at 350. For the latter prong, the Fifth Circuit uses the word "cheat." The jury charge at issue stated that a "specific intent to defraud" means "a conscious, knowing intent to deceive *or* cheat someone." (emphasis added). The Fifth Circuit ultimately found that the disjunctive "or" was a misstatement of the law "[b]ecause deception, alone, will not suffice." The Court cited the Eleventh Circuit in *United States v. Takhalov* to note that "a defendant cannot be convicted of wire fraud[6] on the basis of [a] lie alone…[because] deceiving is a necessary condition of defrauding but not a sufficient one." *Id.* (citing *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), *as revised* (Oct. 3, 2016), *opinion modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016)). The Court reasoned that, because "deception is not synonymous with depriving another of their property interests," the intent to defraud element required a specific intent to cheat. *Greenlaw*, 84 F.4th at 351. The Fifth Circuit has therefore concluded that "intent to defraud" requires **both** 1) an intent to deceive and

---

[5] The Court notes that, while it will attempt to discuss these two requirements as separate and distinct elements (as it believes this is the most accurate reading of the law), prior courts' discussions have not always been so delineated.
[6] The *Takhalov* case concerned wire fraud, but the Fifth Circuit noted in a footnote in *Greenlaw* that a district court's analysis of the securities fraud statute under Title 18 should be guided by caselaw on the mail and wire fraud statutes under Title 18. *Greenlaw*, 84 F.4th at 339 n.4.

(2) an intent to cause some harm to result from the deceit (i.e., an intent to cheat). "Cheat" as indirectly defined by the Fifth Circuit means "*to deprive the victim of money or property* by means of deception." *Greenlaw*, 84 F.4th at 351 (citing *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020)).

### C. Scheme to Defraud

In addition to addressing the "intent to defraud" element, the Fifth Circuit in *Greenlaw* also discussed the necessary "scheme to defraud" element. This discussion, unfortunately, did not result in a clear holding. The Circuit was faced with a similar disjunctive "or" in the trial court's "scheme to defraud" instruction. The instruction defined "scheme to defraud" as "any plan, pattern or course of action intended to deprive another of money or property *or* bring about some financial gain to the person engaged in the scheme." *Id.* at 349. The Circuit panel declined to rule on whether this disjunctive "or" was erroneous (i.e., whether an "and" would have been more appropriate). *Id.* at 352.

Nevertheless, the Fifth Circuit cited authority that suggests a "scheme to defraud" requires depriving another of money or property and bringing about some financial gain to the defendant. For example, the Circuit panel cited *Shaw v. United States,* 580 U.S. 63, 73 (2016). In *Shaw,* the Supreme Court agreed with the parties that "the scheme must be one to deceive the bank *and* deprive it of something of value." *Id.* (emphasis in original). In addition, the Circuit cited *United States v. Ratcliff,* 488 F.3d 639, 645 (5th Cir. 2007), in which the Fifth Circuit affirmed the district court's order dismissing an indictment where it alleged only deceitful conduct and failed to allege a scheme that wronged the victim's property rights. Thus, the clear implication is that the "scheme to defraud" element should also be in the conjunctive, and that the Government must not

7

only plead a pattern of action that is intended or designed to bring about some financial gain to the wrongdoer, but also a pattern that is intended or designed to deprive another of money or property.

Finally, as noted above, the Supreme Court later held in *Ciminelli* that the federal fraud statutes are "limited in scope to the protection of property rights." *Ciminelli*, 598 U.S. at 313. In other words, the object of the "scheme to defraud" as alleged must be anchored in the deprivation of a victim's traditional property right, not merely the right to information necessary for the person or entity to make discretionary economic decisions. *Id.*

### D. Parties' Arguments

Defendants argue that the allegations in the Indictment are defective for two overlapping reasons. First, they claim the Indictment is based on a "right to control" theory, including that the Defendants "gained money" "by allegedly depriving their Twitter followers of potentially valuable economic information." (Doc. No. 397 at 7). Plus, Defendants note that "the harm vested on people must come from the deceit." (*Id.*). They argue that "even if the 'deception' might have influenced the "co-investors'" initial discretionary decisions to purchase the shares…the Government does not allege that any such investor suffered actual harm *because of* the deception." (*Id.* at 8).

In response, the Government argues that the Indictment "more than adequately alleges a scheme to defraud victims of money or property." (Doc. No. 422 at 1). The Government claims that the Indictment "adequately tracks the language of [the statute]." The Government also contends that the factual allegations, which include a quote by one of the Defendants that they were "robbing…idiots of their money," sufficiently demonstrates specific intent to defraud victims. (Doc. No. 134 at ¶ 49). The Government also contends that "actual harm [to investors] is irrelevant because, as the *Greenlaw* court made clear, the law punishes the scheme to defraud, not its success." (Doc. No. 422 at 5).

8

### E. Whether the Indictment Alleges an Offense

The most glaring issue in the Indictment is the dearth of factual allegations that connect the alleged "scheme" to the deprivation of the other investors' traditional property interests (i.e., allegations demonstrating that the object of the scheme involved harm to victims). The *Greenlaw* court described a "scheme to defraud" as "any false or fraudulent pretenses or representations intended to deceive others in order to obtain something of value, such as money, **from the entity to be deceived**." *Greenlaw*, 84 F.4th at 339 (emphasis added). Per *Ciminelli*, the Title 18 fraud statutes criminalize "only schemes to deprive people of traditional property interests." *Ciminelli*, 598 U.S. at 309. Again, typically, this means money or property.

The Court is most persuaded by the Defendants' argument above that the analysis of "scheme to defraud" as outlined by *Ciminelli* applies squarely here.

Here, the language of the Indictment uses the terms "intent to defraud" and "scheme to defraud." When it comes to "scheme to defraud," however, the Indictment does not allege that the Defendants actually harmed anyone's traditional property interests (or that the object of the scheme was to harm anyone's traditional property interests). There are allegations that the Defendants intended to "maximize" their own trading profits (*see* Doc. No. 134 at ¶ 12, 14) and that Defendants in fact profited from their activities (*see, e.g., id.* at ¶ 1, 26, 27, 28, 31, 39). These allegations adequately allege that obtaining financial gain was an object of the Defendants' scheme to defraud; obtaining financial gain, however, is only half of the equation. It is the other half of the equation— harming a victim's traditional property right—that is lacking.

The Indictment at ¶ 12 states that "the defendants used their credibility to maximize their own trading profits through their tweets and posts in Atlas Trading Discord, ***often at the expense*** of their Twitter followers and members of Atlas Trading Discord." (*Id.* at ¶ 12). That allegation,

9

however, underscores the issue with the Government's allegations when accepted as true—the defendants may have "used their social media influence to pump and dump securities for their own financial gain," but the language of the Indictment indicates that losses to victims happened incidentally (i.e., "at the expense of") rather than as the "object of" the alleged scheme. (See Doc. No. 134 at ¶ 12). Rather than plead a scheme aimed at harming someone's traditional property right, the scheme as pleaded is totally indifferent to its effect on the alleged victims. Many of the alleged victims may have actually made money. This was confirmed at the oral arguments. Moreover, even accepting as true that the alleged victims ultimately lost money on the stock market because the value of their shares went down, the Defendants did not obtain something of value from the entity to be deceived. The investors' trading losses are one step too far removed from the Defendants' alleged fraudulent misrepresentation. Instead, the property right of the investors that the Defendants' conduct harmed was their right to control their assets, or stated another way, was their right to make an informed discretionary decision.

The key question is whether one statement by one of the co-defendants that "we're robbing…idiots of their money,"[7] which is alleged in the Indictment, is sufficient (when taken as true) to allege 1) a specific intent to defraud and 2) that the Defendants executed or attempted to execute a scheme to defraud. The Court finds that this is not the case. This statement sufficiently alleges "intent to defraud"—and probably survives a *Greenlaw* analysis on that basis—but does not on its own sufficiently allege that Defendants executed, or conspired to execute, a "scheme to defraud" investors of money or property as defined in *Ciminelli*. Just because a conspirator believed he was "robbing…idiots," does not make it so, especially when the mechanism or object

---

[7] *See* Doc. No. 134 at ¶ 49.

of the scheme, as alleged, did not deprive others of their traditional property rights.[8] As Defendants point out, the Indictment "fatally does not allege" that any Defendant intended to or actually deprived *any* individual investor of *any* money or property." (Doc. No. 434 at 2).

While it may be somewhat of a close call as to whether the Indictment survives a *Greenlaw* analysis as to the intent to defraud prong, it certainly fails a *Ciminelli* analysis. This Court finds that the Government's allegations in the Indictment at best allege a "right-to-control" theory rather than a theory grounded in the deprivation of victims' traditional property interests.[9] The Indictment alleges for example that the Defendants "sought to conceal from, and further mislead, their Twitter followers and members of Atlas Trading Discord about the defendants' true trading positions and intentions." (Doc. No. 134 at ¶ 14). This describes a scheme (as described in *Ciminelli*) to deprive victims of "potentially valuable economic information necessary to make discretionary economic decisions." *See Ciminelli*, 598 U.S. at 308. It is not a scheme to deprive victims of traditional property interests like money or property. The Supreme Court has held depriving individuals of crucial information does not constitute fraud under the federal fraud statutes—even if that deprivation was part and parcel of a deceitful scheme. The Government here has alleged facts which indicate, if true, that the Defendants may have had an intent to deceive and an intent to deprive their social media followers of valuable economic information but does not allege a scheme to defraud consistent with the Supreme Court's holding in *Ciminelli* or the Fifth Circuit's holding in *Greenlaw*.

---

[8] The Court notes that nothing in this opinion should be read as condoning the conduct alleged in the Indictment. If true, this conduct demonstrates a lack of veracity, candor, and character in addition to an overwhelming propensity for putting their own well-being ahead of their followers regardless of consequence. This, however, does not necessarily make such conduct illegal—at least as charged—especially in light of the recent decisions of the Supreme Court and Fifth Circuit that this Court is compelled to follow.

[9] *See United States v. Nordlicht*, No. 16-CR-00640, 2023 WL 4490615 (E.D.N.Y. July 12, 2023) (granting Rule 29 motion "[b]ecause no reasonable jury could find that defendants intended to defraud bondholders of anything other than "potentially valuable economic information.").

In short, even taking the facts as alleged in the indictment as true, the Court finds that a crime has not been stated under 18 U.S.C. § 1348 and 2, and 18 U.S.C. § 1349 as interpreted by *Ciminelli*. The Defendants' alleged conduct cannot amount to a "scheme to defraud" as a matter of law. This is because, while it certainly aimed to bring about financial gain to the Defendants, the object of the scheme was not deprivation of alleged victims' property rights. According to the Indictment, the investors were deprived of information regarding the Defendants' true trading intentions, independently invested money in the stock market, and the value of those investments declined. Unlike a traditional fraud case, in which the victim directly surrenders their property to the defendant (or an entity in the defendant's control), the investors here surrendered their property to the stock market at market prices, and in return, received the benefit of the bargain in the form of securities. Thus, the scheme did not deprive investors of their money or property through any misrepresentation; the misrepresentations deprived them only of accurate information necessary to make discretionary economic decisions.

For the many reasons outlined above, the Court finds, as a matter of law (when taking the allegations of the Indictment as true), that the Indictment is defective for failing to state an offense and must be dismissed without prejudice pursuant to Fed. R. Crim. Pro. 12(b)(3)(B)(v).

Signed at Houston, Texas, on this the 20th day of March, 2024.

Andrew S. Hanen
United States District Judge